# EXHIBIT "1"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Patricia A. Law (SBN 163661)
Stacy K. Brigham (SBN 174217)
**LAW OFFICES OF PATRICIA A. LAW**
**A PROFESSIONAL CORPORATION**
10837 Laurel St. Suite 101
Rancho Cucamonga, CA 91730
Telephone: (951) 683-8320
Facsimile:  (951) 683-8321

Attorneys for Plaintiff, GEORGENE M. SPANOS

**FILED**
Superior Court of California
County of Riverside
**12/5/2018**
**I. Siracusa**

By Fax

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE

| | |
|---|---|
| GEORGENE M. SPANOS<br><br>Plaintiff,<br><br>v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS and SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, and DOES 1 -100, inclusive<br><br>Defendants. | Case No.:**RIC1826454**<br><br><br>**COMPLAINT FOR DAMAGES;**<br>**DEMAND FOR JURY TRIAL** |

**I. INTRODUCTION**

1.  Plaintiff, GEORGENE SPANOS ("GEORGENE"), a KAISER FOUNDATION HEALTH PLAN, INC. (KFHP) member, began suffering from severe leg pain which started in October of 2014.  Between October 7, 2014 and December 17, 2014, GEORGENE had 18 appointments with SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP ("SCPMG") providers at their clinics and at the KAISER FOUNDATION HOSPITALS (KFH) who failed to properly work her up for the leg pain and failed to diagnose her very serious life threatening condition.

2.  SCPMG physicians committed egregious medical negligence which resulted in

1

Georgene having to undergo an above knee amputation on December 17, 2014.  Georgene brought a claim for medical negligence against the providers which settled in August of 2018.

## II.  THE PARTIES

3.  Plaintiff, GEORGENE SPANOS is, and at all relevant times was, a resident of the State of California and of the County of Riverside and was at all times a KAISER FOUNDATION HEALTH PLAN, INC.  member.  She was required by the terms of that health plan to seek all of her medical treatment from Southern California Permanente Medical Group facilities and their physician partners.  She was required to seek her emergent medical services at Kaiser Foundation Hospitals.  At all times mentioned herein GEORGENE did in fact seek all of her medical treatment from Southern California Permanente Medical Group facilities and their physician partners.  She also sought her emergent medical services at Kaiser Foundation Hospitals.

4.  Defendant SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP is, and at all relevant times was, a medical partnership duly organized and existing under the laws of the State of California.  SCPMG is the organization that provides physician services to members of the KAISER FOUNDATION HEALTH PLAN, INC ("KFHP") in Southern California.  Defendant, KFHP is the organization that provides health insurance to GEORGENE by and through her husband, Russell Spanos' employment and enrollment.

## III.  FACTUAL BACKGROUND

### A. GEORGENE's Enrollment in Kaiser

5.  Russell Spanos initially enrolled in Kaiser through his trade union, The Teamsters and Food Employers Security Trust Fund.  The Fund contracted with Kaiser Foundation Health Plan, Inc. To provide a plan of health insurance to its members and their spouses known as the KAISER PERMANENTE: FOOD TRUST TRADITIONAL PLAN-SOUTH.  GEORGENE has at all times mentioned herein been covered under the plan as the spouse of an enrolled member.

2

6. GEORGENE has never been a signatory to any enrollment agreement and therefor is not subject, in a bad faith insurance claim, to binding arbitration. Further, the claims made herein are a result of KFHP's and SCPMG's violation of the insurance plan's express terms. Those Defendant's breach of the insurance plan's express terms render the binding arbitration clause invalid.

**B. The Kaiser Plan**

7. GEORGENE is enrolled in a Kaiser Permanente Plan which provides medically necessary care in exchange for monthly premiums (the "Plan"). GEORGENE and Russell Spanos did everything required of them under the contract.

8. Kaiser guarantees that its "medical care program gives [the member] access to all of the covered Services [the member] may need. . . ." The services which are covered are those that are deemed medically necessary. Kaiser's Explanation of Benefits defines the term medically necessary as follows:

> A Service is Medically Necessary if it is medically appropriate and required
> to prevent, diagnose, or treat your condition or clinical symptoms in accord
> with generally accepted professional standards of practice that are consistent
> with a standard of care in the medical community.

In accord with the Insurance Contract, GEORGENE was entitled to all medically necessary care and treatment.

**C. GEORGENE begins experiencing unexplained severe leg pain**

9. On October 2, 2014, GEORGENE saw her primary care doctor and reported feeling well with no complaints and that she was doing well.

10. On October 7, 2014, GEORGENE presented to a Kaiser Clinic and was seen by Family medicine physician, Bradley Gonzalez, M.D. She complained of a 5 day history of upper leg and anterior shin pain which came on suddenly and not as a result of any event. There was tenderness to palpation. She was prescribed robaxen and told to use heat and was given exercises. Dr. Gonzalez ordered a D-Dimer test to check for vascular insufficiency, but then canceled it.

11. GEORGENE presented to Urgent Care on October 13, 2014 with a 3-day history of progressive leg pain that was worse with standing, walking, weight bearing, and when moving her right ankle. For the first time, she was complaining of severe tenderness to touch in the front of the right shin. Lab studies were ordered in connection with this visit.

12. On October 24, 2014, GEORGENE saw physical medicine doctor, Dr. Huey, with complaints of severe leg pain and she was found to have numbness, tingling, and tenderness of the right leg and foot. Radiographic studies were recommended.

13. On October 31, 2014, GEORGENE emailed Dr. Huey and informed him, among other things, that her right foot was completely numb and that she could not walk.

14. On November 3, 2014, GEORGENE emailed Dr. Kim, stating, among other things, that she was experiencing leg pain and that her right foot was completely numb. She also stated that she could not feel her right foot and that her leg pain was horrible.

15. GEORGENE saw Dr. Kim on November 4, 2013 where she described her pain as a squeezing aching pain that was worse with walking. She also reported numbness over her entire right foot. Upon exam, she had decreased sensation in the right foot.

16. GEORGENE emailed Dr. Kim on November 7, 2014 and informed him that, among other things, she was still having pain running through her right leg and that her foot was still numb. She also described that "it feels like it is on fire, but touch wise it is ice cold."

17. GEORGENE emailed Dr. Kim on November 11, 2014 complaining stating "I have no feeling in my right foot," among other complaints consistent with those above.

18. On November 17, 2014, GEORGENE presented to Urgent Care. The records indicate that she complained of low back pain. She saw Dr. Kim the next day for an epidural injection.

19. On November 21, GEORGENE returned to urgent care for low back and radiating leg pain. On November 26, 2014, GEORGENE again presented to the Emergency Department complaining of leg pain. The ER doctor claims there was no loss of sensation to the foot/toes.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

20. The very next day, on November 27, 2014, GEORGENE saw the neurosurgeon with complaints of right lower extremity pain/numbness since October. She complained of constant numbness in all toes and feeling weaker in the right leg. GEORGENE had a sensory deficit and hyperesthesia in her right foot. The neurosurgeon could not find an anatomic basis for her symptoms and did not feel that she would benefit from surgery. He was unable to correlate her pain, weakness and numbness to any pathology in her back.

21. On November 30, 2014, GEORGENE returned to the Emergency Department with sharp, burning pain to her right leg. She had decreased sensation and paresthesia. She was given pain medication and discharged.

22. GEORGENE again presented the Emergency Department on December 4, 2014 where she described her leg pain as burning and sharp to the lateral aspect of her lower leg. She also had developed a black spot on the underside of her foot with cracked skin and bleeding on her right heel. She was given medication and discharged home.

23. On December 8, 2014, GEORGENE saw Dr. Huey complaining that she could not walk. She had leg pain, numbness, and tingling of the right leg and foot with dry skin tears at the heel and a black spot on her lateral right foot. She also had decreased sensation to and weakness in the right leg. Nerve tests were ordered and she was referred to vascular surgery.

24. GEORGENE presented to Dr. Sung Kim for a vascular consult on December 11, 2014. GEORGENE had decreased sensation on the right foot with right ankle edema. The impression was an ischemic right leg due to arterial occlusive disease and Ms. Spanos was admitted to the hospital. The plan was for a CT angiogram and heparin anticoagulation.

25. Testing revealed thrombosis of the right external iliac, common femoral and superficial femoral arteries and thrombolytic therapy was started. Only the common femoral artery and profunda femoris arteries could be opened. Accordingly, GEORGENE underwent an above the knee amputation on December 17, 2014.

///

///

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

**D.  Facts giving rise to this claim for bad faith / breach of the insurance contract**

26.  Kaiser Foundation Health Plan (KFHP) has more than 13 million members and is one of the largest managed health care corporations in the US.

27.  KFHP claims to have an integrated care model, offering both hospital and physician care through a network of hospitals and physician practices operating under the Kaiser Permanente name. Members of Kaiser health plans are supposed to have unfettered access to hospitals and hundreds of other health care facilities operated by Kaiser Foundation Hospitals and the Permanente Medical Groups.

28.  Kaiser Permanente is an American integrated managed care consortium, based in Oakland, California, founded in 1945 by industrialist Henry J. Kaiser and physician Sidney Garfield. Kaiser Permanente is made up of three distinct but interdependent groups of entities: the Kaiser Foundation Health Plan, Inc. (KFHP) and its regional operating subsidiaries; Kaiser Foundation Hospitals (KFH); and the regional Permanente Medical Groups. The medical group providing services in this case was Southern California Permanente Medical Group (SCPMG).

29.  As of December 2017, Kaiser Permanente had over 13 million health plan members, 225,000 employees, 23,275 physicians, 58,072 nurses, 43 medical centers, and 750 medical facilities.  As of December 31, 2017, the "non-profit" Kaiser Foundation Health Plan and Kaiser Foundation Hospitals entities reported a combined $3.8 billion in net income on $72.7 billion in operating revenues.  Each Permanente Medical Group operates as a separate "for profit" partnership or professional corporation in its individual territory, and while none publicly reports its financial results, each is primarily funded by reimbursements from its respective regional Kaiser Foundation Health Plan entity. KFHP is one of the largest, if not the largest "not-for-profit" organizations in the United States.

By its own admission Kaiser claims that:

**A.** KFHP works with employers, employees, and individual members to offer prepaid health plans and insurance. The health plans are not-for-profit and provide infrastructure for and invest in Kaiser Foundation Hospitals and provide a tax-exempt shelter for the for-profit medical groups.

**B.** Permanente Medical Groups are physician-owned organizations, which provide and arrange for medical care for Kaiser Foundation Health Plan members in each respective region. The medical groups are for-profit partnerships or professional corporations and receive nearly all of their funding from Kaiser Foundation Health Plans. The first medical group, The Permanente Medical Group (TPMG), formed in 1948 in Northern California. Permanente physicians become stockholders in TPMG after three years at the company.

30. Kaiser Foundation Hospitals operates medical centers in California, Oregon, Washington and Hawaii, and outpatient facilities in the remaining Kaiser Permanente regions. The hospital foundations are not-for-profit and rely on the Kaiser Foundation Health Plans for funding. They also provide infrastructure and facilities that benefit the for-profit medical groups.

31. KFHP provides to its members health insurance through managed care and/or a health maintenance organization.  In this case, Russell Spanos' labor union, The Teamsters and Food Employers Security Trust Fund contracted with Kaiser Foundation Health Plan, Inc. To provide a plan of health insurance to its members and their spouses known as the KAISER PERMANENTE: FOOD TRUST TRADITIONAL PLAN-SOUTH.  The provision of health maintenance benefits and health insurance was under said contract. The Trust Fund, Russell Spanos and Georgene Spanos were charged premiums and co-pays for that coverage for over a decade prior to the events sued upon herein and they continue to pay said premiums and co-pays through the present. The provision of those benefits to the

Spanos' has always been based on a contract. In exchange for the Trust Fund and the Spanos' paying premiums and co-pays, KFHP, KFH and SCPMG have a legal duty to provide coverage, uphold the terms of the policy, pay valid claims and provide medically necessary services as provided in the policy.

32.  When an insurance company or managed health care provider fails to fulfill that duty, policyholders have a right to hold their insurer or managed health care service provider accountable in a bad faith lawsuit.  It is based thereon that these causes of action are brought.

33.  Bad faith exists whenever Kaiser Foundation Health Plan  (KFHP) unreasonably fails to uphold its end of the bargain. Insurance companies are legally required to act in good faith and to use only fair claims practices. California law defines certain acts and conduct that can qualify as bad faith. They include, but are not limited to, the following that are of particular  interest in this case:

(1) Unreasonable denial of policy benefits including withholding necessary services and durable medical equipment;

(2)  Misrepresenting facts or policy provisions to claimants;

(3) Failing to respond or act promptly with respect to a claim;

(4) Not having reasonable standards for the prompt investigation and processing of claims;

(5) Failing to either approve or deny claims within a reasonable time period after the insured has submitted adequate proof of loss;

(6) Refusing to make a good faith effort to fairly settle claims when liability is reasonably clear or failing to settle one part of a claim in order to influence other

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

parts of the claim;

(7) Compelling the insured to litigate the claim because the insurance company has refused to make an adequate settlement offer;

(8) Requesting repeated continuances of the arbitration in order to stall payment of the claim and withhold continuing and necessary services such as prosthetics and physical therapy;

(9) Compelling Claimant to answer irrelevant questions in a medical appointment to determine covered benefits for the purpose of gathering evidence to defeat a valid claim for medical negligence in a forum where she was not represented by Counsel;

(10) Conspiring with damages experts hired by the Kaiser attorneys in the arbitration in order to minimize damages in a pending Arbitration;

(11) Attempting to settle for an amount that appears unreasonable when compared to statements made in written or printed advertising material that accompanied the application for insurance;

(12) Manipulating the coverage and benefits in order to minimize the Claimant's damages in an arbitration under way;

(13) Interfering in the services offered under the policy to affect a valid claim of medical malpractice;

(14) Fraudulently promising the provision of a certain prosthetic devices to reduce damages in an arbitration and then;

(15) Revoking those offered services immediately after settlement of a valid claim of medical malpractice;

(16) Threatening to delay an arbitration award in an attempt to compel the insured

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

to accept a settlement less than what was awarded in arbitration;

(17) Failing to provide prompt justification for the denial of a claim.

34.  These are just some of the bad faith examples that constitute grounds for bringing this  bad faith claim against KFHP, KFH and SCPMG and it is expected that more will be discovered through the litigation process.

**What we know thus far follows:**

35.  Between October and December of 2014 Georgene Spanos presented to the Kaiser Foundation Hospital (KFH) and the SCPMG clinic facility in Riverside on no less than 18 occasions complaining of excruciating leg pain.  She was repeatedly ignored and her symptoms were downplayed by the Kaiser physicians.  She was accused of psychological issues, drug seeking and exaggeration.  Finally, in December of 2014, she was seen by one caring and competent physician who immediately diagnosed her with an arterial blockage in her leg.  Unfortunately, it was too late and she required an above knee amputation (AKA).

36. GEORGENE and her husband Russell sought the services of a medical malpractice attorney to evaluate whether they had a valid claim against the Kaiser entities and its partner physicians for failing to diagnose her condition and causing her AKA.  After reviewing the medical records, it was determined that this was one of the most profound cases of medical negligence ever seen and a claim was filed in the Kaiser Arbitration system on behalf of the Spanos'.

37.  During the pendency of the claim in arbitration, GEORGENE and Russell Spanos continued to be KFHP members, continued to pay premiums and co-pays for that insurance and continued to be reliant on KFHP, KFH and SCPMG for Georgene's recovery and rehabilitation from the AKA through physical therapy, stump management and pain management and for durable medical equipment such as an appropriate prosthetic leg, prosthetic knee joints, liners/socks and other items necessary to manage an AKA.

38. KFHP by and through SCPMG refused to continue to offer physical therapy services. KFHP withheld necessary prosthetic devices and services to which GEORGENE was entitled, through not only her KFHP program, but also through Medi-Care once she became eligible. This failure to provide medical services went on for almost 3 years. During this time, the Kaiser entities were well aware that their on-going refusal to provide the services was having a deleterious effect on GEORGENE, both mentally and physically. She was continuing to need the services of a mental health professional to deal with the depression occasioned by the amputation. She was also becoming deconditioned by the fact that she could not walk without the C-leg and microprocessor knee. Further, she informed Kaiser on a number of occasions that she had fallen with the substandard and out-dated prosthetic and that she had been told that those falls would be avoided if she were to get the microprocessor knee and the C-leg.

39. Over the period of years between late 2015 and August of 2018, the Kaiser entities, by and through their legal Counsel, repeatedly requested continuances of the pending arbitration dates. Each time the requests were granted over the Claimants' objection. In all, 3 continuances were requested by Kaiser resulting in an 18 month delay in getting the case to arbitration. During that time, GEORGENE was denied on-going services, particularly physical therapy and an appropriate microprocessor knee and C-leg prosthesis. When the last continuance was demanded by Kaiser, Counsel for the Kaiser entities was informed by the Arbitrator that no further continuance requests would be allowed or considered. Even then, Kaiser tried to get the arbitrator disqualified so that they would be granted another continuance.

40. As the date for the Arbitration drew close, expert discovery commenced on the issues of liability, causation and damages. Because Kaiser refused to pay what was a clearly righteous medical malpractice case, the Claimants were required to hire the services of seven different experts, including a life care planner and economist. The Claimants' life care plan included the provision of certain necessary knee and leg

prosthetics and the private pay cost for those prosthetics based on the fact that KFHP had refused to provide those prosthetics despite GEORGENE's repeated and continuous requests for them over the preceding 3 years.

41. At the deposition of the Claimant's life care planner on July 12, 2018, it became obvious that the economic damages (costs) for the provision of private pay prosthetics was a significant portion of the damages and the cost of the private pay for the prosthetics would most certainly bring the award in the arbitration hearing in excess of the CCP Section 998 offer to compromise the claim sent two years earlier. The Kaiser Defendants realized that their exposure in the case was much larger than if they were to promise to provide the prosthetics they had been withholding from Georgene. Miraculously, without any explanation, days after the Claimant's life care planner's deposition, GEORGENE was contacted by Kaiser to inform her that a "trial" of the microprocessor knee and the C-leg she had been asking for for over 2 years had finally been approved. She was told that she would have the Trial for no more than 6 weeks and then she would be given the permanent components after the 6 week Trial. At around this same time, Kaiser also convened a durable medical equipment appointment with Georgene at which they asked her a number of questions regarding her need for or ongoing use of the line items spelled out in the Plaintiff's life care plan. It has become obvious that this was done for the purpose of gathering evidence against Georgene in an ex parte setting in order to use it against her at the Arbitration. That meeting had absolutely no medical necessity and even those Kaiser employees in attendance commented that they were unsure why the meeting had been convened or why they had been asked to attend. In the 5 months since that meeting, no decisions for medical care have been made, nor has there been any follow up from the meeting now that the malpractice case has come to a close. There is no other explanation for why the meeting was convened other than for nefarious reasons. This is evidence of Kaiser health care providers and employees conspiring with the attorneys to defeat a valid claim for medical negligence.

42. GEORGENE accepted the Trial of the prosthetic knee and C-leg in early August of 2018.

43. Settlement negotiations were on-going during the months of July and August of 2018. Kaiser's settlement negotiations stalled as soon as the trial of the microprocessor knee and C-leg was "approved" by Kaiser and accepted by Georgene. Kaiser, through its Counsel, took the position that because Kaiser was now providing the prosthetics, the damages were significantly reduced as there was no need to include the "private pay costs" of the leg because Kaiser would be providing a permanent prosthetic.

44. In August of 2018, the Claimants settled the case for $750,000 based on the medical malpractice pain and suffering caps in California and the fact that Kaiser was now providing the needed services that had been withheld. Kaiser had also hired the services of an expert who would give testimony on health care actuarial costs, Thomas Dawson. He was going to testify that as long as the Spanos' kept paying their premiums, Kaiser would now continue to provide the necessary components of the appropriate prosthetics.

45. Following the consummation of the settlement, Kaiser refused to provide the permanent prosthesis. It became clear at that point in time that Kaiser's earlier conduct (of failing to provide the prosthesis) was not simply a good faith belief that the services were not medically necessary, but a purposeful act to punish the Claimant for bringing a claim. As of the time of the filing of the lawsuit, 18 weeks after the Trial, the prosthetic was provided, Kaiser still has not provided Georgene her permanent knee and leg. In fact, Kaiser won't even respond to Georgene's inquiries about the permanent prosthesis. Kaiser is, however, making overtures about taking the trial knee and C-leg back from her. The post settlement refusal to provide a permanent prosthetic confirms Kaiser's bad faith conduct.

46. The Kaiser entities committed the following acts of bad faith:

(a) Unreasonable denial of policy benefits including withholding necessary services and durable medical equipment by refusing to authorize on-going physical therapy and refusal to provide a proper prosthesis for Georgene Spanos' amputated

leg and knee.

(b) Misrepresenting facts or policy provisions to claimants by Kaiser's continuing claim that Georgene did not meet the eligibility requirements for a C-leg and micro-processor knee even though her Kaiser prosthetist told Kaiser that she did meet the eligibility requirements.

( c) Failing to respond or act promptly with respect to a claim for failure to provide those necessary services during the pending medical malpractice claim.

(d) Not having reasonable standards for the prompt investigation and processing of claims resulting in a withholding of a C-leg and micro-processor knee even though her Kaiser prosthetist told Kaiser that she did meet the eligibility requirements.

(e) Failing to either approve or deny claims within a reasonable time period after the insured has submitted adequate proof of loss for their refusal to give a valid explanation of why she was not being provided a C-leg and micro-processor knee even though her Kaiser prosthetist told Kaiser that she did meet the eligibility requirements.

(f) Refusing to make a good faith effort to fairly settle claims when liability is reasonably clear or failing to settle one part of a claim in order to influence other parts of the claim for Kaiser's refusal to accept liability and fairly resolve a very egregious case of medical negligence.

(g) Compelling the insured to litigate the claim because the health plan has refused to make an adequate settlement offer resulting in Claimants' incurring over $100,000 in litigation related costs.

(h) Requesting repeated continuances of the arbitration in order to stall payment of the claim and withhold continuing and necessary services such as prosthetics and physical therapy for 3 continuance requests spanning 18 months.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

(i) Compelling Claimant to answer irrelevant questions in a "medical appointment" to determine covered benefits for the purpose of gathering evidence to defeat a valid claim for medical negligence in a forum where she was not represented by Counsel for the durable medical equipment meetings immediately prior to the Arbitration where Claimant was asked questions like: "Do you still need or use your bedside commode, How often do you use your wheelchair, Why didn't you go to physical therapy, (even though Kaiser had refused to authorize physical therapy). Those questions were formulated using the life care plan that Claimants' expert prepared and the questioning was designed to attempt to impeach the Claimants' expert with answers given by the Claimant in an ex parte bogus interview conducted by Kaiser employees at the request of Kaiser management and attorneys.

(j) Conspiring with damages experts hired by the Kaiser attorneys in the arbitration in order to minimize damages in a pending Arbitration by miraculously approving a trial of a microprocessor knee and a C-leg weeks before the arbitration was set to begin.

(k) Manipulating the coverage and benefits in order to minimize the Claimant's damages in an arbitration under way by miraculously approving a trial of the microprocessor knee and C-leg days before the arbitration was set to begin.

(l) Interfering in the services offered under the policy to affect a valid claim of medical malpractice by miraculously approving the trial of the microprocessor knee and the C-leg days before the arbitration was set to begin and then refusing to provide a permanent prosthetic after the case settled.

(m) Fraudulently promising the provision of a certain prosthetics to reduce damages in an arbitration and then revoking those offered services immediately after settlement of a valid claim of medical malpractice.

## FIRST CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**PLAINTIFF, FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH 100, INCLUSIVE, FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, ALLEGES:**

47. Plaintiff refers to each and every paragraph of the Complaint and incorporates those paragraphs as though set forth in full in this cause of action.

48. Defendants, and each of them have breached their duty of good faith and fair dealing owed to Plaintiff in the following respects:

> (a) Unreasonably denying and delaying physical therapy and prosthetic fitting and devices to GEORGENE that were covered under the Evidence of Coverage and The Teamsters and Food Employers Security Trust Fund's KAISER PERMANENTE: FOOD TRUST TRADITIONAL PLAN-SOUTH;

> (b) Unreasonably avoiding incurring expenses for physical therapy and prosthetic devices which were covered under the Evidence of Coverage, for its own financial gain;

> ( c) Unreasonably failing to give at least as much consideration to GEORGENE 's interests and welfare in the investigation and handling of her claims as they gave their own interests;

> (d) Unreasonably engaging in a pattern and practice of failing to give a least as much consideration to its members' interests and welfare in the investigation and handling of their claims as they gave their own interests;

> (e) Unreasonably placing its own financial interests ahead of GEORGENE's recovery;

> (f) Unreasonably engaging in a pattern and practice of placing its own financial interests ahead of its members' health care;

16

(g) Unreasonably failing to conduct a thorough, fair and balanced investigation in evaluating GEORGENE's requests for benefits under the Evidence of Coverage;

(h) Unreasonably engaging in a pattern and practice of failing to conduct a thorough, fair and balanced investigation in evaluating requests for benefits and/or services for its members under the Evidence of Coverage;

(i) Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of its members by failing to diligently search for and consider evidence that supports a member's claim for benefits and/or services under the Evidence of Coverage.

49. Plaintiff is informed and believes and thereon alleges that defendants, and each of them, have breached their duty of good faith and fair dealing owed to plaintiff by other acts and omissions of which plaintiffs are presently unaware and which will be shown according to proof at the time of trial.

50. As a proximate result of the aforementioned unreasonable and bad faith conduct of defendants, and each of them, plaintiff has suffered, and will continue to suffer in the future, damages under the Plan, plus interest and other economic and consequential damages, for a total amount to be shown at the time of trial.

51. As a further proximate result of the unreasonable and bad faith conduct of defendants, and each of them, plaintiff has suffered physical injury, anxiety, worry, and mental and emotional distress, all to her general damages in a sum to be determined at the time of trial.

52. As a further proximate result of the aforementioned wrongful conduct of defendants, plaintiff was compelled to retain legal counsel to obtain the benefits due under the Plan, Therefore, defendants are liable to plaintiff of those attorneys' fees reasonably

necessary and incurred by plaintiff in order to obtain the benefits due under the Plan in a sum to be determined at the time of trial.

53. The defendants' conduct described herein was intended by defendants to cause injury to plaintiff, or was despicable conduct carried on by the defendants with a willful and conscious disregard of the rights to plaintiff or subjected plaintiff to cruel and unjust hardship in conscious disregard of the plaintiff's rights, or was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendants with the intention to deprive plaintiff of property or legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code section 3294, thereby entitling plaintiff to punitive damages in an amount appropriate to punish or set an example of defendants.

54. Defendants' conduct described herein was undertaken by the corporate defendants' officers or managing agents, identified herein as DOES 1 through 100, inclusive, who were responsible for claims supervision and operations, underwriting, communications, and/or decisions. The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the corporate defendants. Further, said corporate defendants had advance knowledge of the actions and conduct of said individuals whose actions and conduct were ratified, authorized and approved by managing agents whose precise identities are unknown to plaintiff at this time and are therefore identified and designated herein as DOES 1 through 100, inclusive.

## SECOND CAUSE OF ACTION
### (Breach of Contract)
**PLAINTIFF, FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH 100, INCLUSIVE, FOR BREACH OF CONTRACT, ALLEGES:**

55. Plaintiff refers to each and every paragraph of the Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

56. At all pertinent times, plaintiff has done everything required of them under the Plan. Defendants, and each of them, breached the terms of the Plan by failing to provide benefits GEORGENE was entitled to under the Plan. Specifically, defendants breached the terms of the Plan to provide medical services in the following respects:

(a) Delaying and denying coverage for physical therapy and appropriate prosthetic devices to GEORGENE that was covered under the Evidence of Coverage;

(b) Denying GEORGENE coverage for physical therapy and prosthetic devices covered under the Evidence of Coverage before conducting a reasonable investigation of her requests for said services;

( c) Failing and refusing to provide GEORGENE with coverage for medical care and rehabilitation with knowledge that said benefits were medically necessary and with knowledge that GEORGENE's requests were covered under the Evidence of Coverage;

(d) Placing its own financial interests ahead of GEORGENE's health care;

(e) Avoiding payment for prosthetic devices that were covered under Evidence of Coverage for its own financial gain by ignoring the seriousness of GEORGENE's medical needs; and

(f) Failing and refusing to give at least as much consideration to GEORGENE's interests and welfare in the investigation and handling of her claims as it gave to its own interests.

57. Plaintiff is informed and believes and thereon alleges that defendants have breached the terms and provisions of the Plan by other acts or omissions of which plaintiff is presently unaware and which will be shown according to proof at the time of trial.

58. As a direct and proximate result of defendants' conduct and breach of their contractual obligations, plaintiff has suffered damages under the Plan in an amount to be determined according to proof at the time of trial, plus interest and other foreseeable and incidental damages according to proof, and in amounts to be determined at the time of trial.

### THI RD CAUSE OF ACTION

**(Negligent Infliction of Emotional Distress)**

**PLAINTIFF, FOR T H I R D  C A U S E  O F  A C T I O N  A G A I N S T  D E F E N D A N T S , KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH  100, INCLUSIVE, FOR NEGLIGENT  INFLICTION OF EMOTIONAL DISTRESS, ALLEGES:**

59.  Plaintiff refers to each and every paragraph of the Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

60.  Defendants endangered GEORGENE's safety, health and well-being when they delayed provision of prosthetic devices by refusing to grant GEORGENE's requests therefore even though defendants knew, or should have known, that the medically necessary devices were covered under the Evidence of Coverage. Defendants knew, or should have known, that their refusal to approve diagnostic testing for GEORGENE caused Georgene to be fearful and extremely worried about her condition.  Defendants were repeatedly told that Georgene was falling and injuring herself without the microprocessor knee and C-leg, yet Defendants did nothing to assist her to insure that she would not continue to fall and be injured.  Defendants knowing the seriousness of GEORGENE's medical condition, knowing the physical damage that could result from denying the care, and knowing that plaintiff would get forced to deal with the emotional and physical implication of the denial of the care for GEORGENE's intentionally, unreasonably and unfairly refused to provide GEORGENE with the requested, medically necessary items thereby placing GEORGENE's mental health, safety and life in jeopardy.

61. At all relevant times, defendants owed plaintiffs a duty of care, which they breached.  Defendants were informed that GEORGENE was suffering mentally and physically and that she was falling and injuring herself without the prosthetic requested.

62. Defendants, and each of them, knew, or with any exercise of reasonable care should have known, that their aforementioned wrongful conduct would result in the delay and/or denial of the benefits GEORGENE was entitled to under the Plan, and would

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1   cause plaintiff severe emotional distress.  Despite this knowledge, defendants, and each of

2   them, negligently and without exercising reasonable care, reviewed and made

3   recommendations and decisions, and otherwise engaged in conduct that directly caused

4   benefits to be delayed and denied under the Plan.

5       63. Plaintiff is informed and believe, and thereon allege, that defendants, and each of

6   them, have been negligent by other acts or omission of which plaintiff is presently unaware,

7   and which will be shown accordingly to proof at the time of trial.

8       64.  Defendants' conduct described herein was undertaken by the corporate

9   defendants' officers, managing agents, or employees identified herein as DOES 1 through

10   100, inclusive, who were responsible for claims handling and/or decisions.  The

11   aforementioned conduct of said managing agents and individuals was therefore undertaken on

12   behalf of the corporation defendants. Said corporation defendants further had advance

13   knowledge of the actions and conduct of said individuals whose actions and conduct were

14   ratified, authorized and approved by managing agents and by other corporation officers,

15   directors, or managing agents whose precise identities are unknown to plaintiff at this time

16   and are therefore identified as DOES 1 through 100, inclusive.

17       65.  As a direct and proximate results of the negligent conduct of defendants, and each

18   of them, as alleged above, plaintiff has suffered severe physical, mental, and emotional

19   distress and discomfort, including, but not limited to, suffering, anguish, fright, horror,

20   nervousness, grief, anxiety, worry, shock, humiliation, and shame, all to plaintiff's detriment

21   and damages in an amount to be shown according to proof at the time of trial. The emotional

22   distress caused by defendants was beyond what reasonable person in a civilized society can

23   be expected to bear.

24   / / /

25   / / /

26   / / /

27   / / /

28

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

## FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

**PLAINTIFF, FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH 100, INCLUSIVE, FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, ALLEGES:**

66.  Plaintiff incorporates by reference each and every paragraph of the Complaint as though set forth in full in this cause of action.

67.  Defendants endangered GEORGENE's safety, health and well-being when they delayed provision of prosthetic devices by refusing to grant GEORGENE's requests therefore even though defendants knew, or should have known, that the medically necessary devices were covered under the Evidence of Coverage. Defendants knew, or should have known, that their refusal to approve physical therapy and prosthetic devices for GEORGENE caused Georgene Spanos to be fearful and extremely worried about her condition. She suffered with mental health issues related to the aesthetics of a poor prosthesis as well.

68.  Defendants knowing the seriousness of GEORGENE's medical condition, knowing the physical damage that could result from denying the care, and knowing that plaintiff would get forced to deal with the emotional and physical implication of the denial of the care for GEORGENE intentionally, unreasonably and unfairly refused to provide GEORGENE with the requested, medically necessary items thereby placing GEORGENE's mental health, safety and life in jeopardy.

69.  In light of GEORGENE's condition, the defendants' improper and unreasonable delays and denials constitute extreme and outrageous conduct. By virtue of the fact that the prosthetics were made available in a matter of days after the Claimant's life care planner's criticisms of the failure to provide the prosthetics, it is evident that the Defendants had the wherewithal to provide those services if they so desired.

70.  Defendants, and each of them, intentionally and with malicious motive engaged in said conduct. Said conduct was directed at and was calculated to cause,

1    and did cause, plaintiff to suffer humiliation, mental anguish, and severe emotional

2    distress, in an attempt to gain an advantage over GEORGENE, and deprive

3    GEORGENE of the entitlement to the full benefits to which she was entitled under the

4    Evidence of Coverage.

5        71. As a proximate result of the aforementioned acts, GEORGENE suffered

     fear, depression, humiliation, and severe mental anguish and emotional and physical

6    distress.

7        72. Defendants' conduct described herein was intended by said defendants to

8    cause injury to plaintiff, or was despicable conduct carried on by said defendants with a

9    willful and conscious disregard of the rights, health, and safety of plaintiff, subjected

10   plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights, and was an

11   intentional misrepresentation, deceit, or concealment of a material fact known to

12   defendants with the intention to deprive plaintiff of property, legal rights, or to otherwise

13   cause injury, such as to constitute malice, oppression, or fraud under California Civil Code

14   section 3294, thereby entitling plaintiff to punitive damages in an amount appropriate to

15   punish or set an example of defendants.

16       73. Defendants' conduct described herein was undertaken by the corporate

17   defendants' officers, managing agents, or employees identified herein as DOES 1 through

18   100, inclusive, who were responsible for claims handling and/or decisions. The

19   aforementioned conduct of said managing agents and individuals was therefore undertaken on

20   behalf of the corporate defendants. Said corporate defendants further had advance knowledge of

21   the actions and conduct of said individuals whose actions and conduct were ratified, authorized,

22   and approved by managing agents and by other corporate officers, directors, or managing agents

23   whose precise identities are unknown to plaintiff at this time and are therefore identified and

24   designated herein as DOES 1 through 100, inclusive.

25

26   / / /

27   / / /

28   / / /

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

## FIFTH CAUSE OF ACTION

### (Negligence)

**PLAINTIFF, FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH 100, INCLUSIVE, FOR NEGLIGENCE ALLEGES:**

74. Plaintiff refers to each and every paragraph of the Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

75. Defendants endangered GEORGENE's safety, health and well-being when they delayed provision of prosthetic devices by refusing to grant GEORGENE's requests therefore even though defendants knew, or should have known, that the medically necessary devices were covered under the Evidence of Coverage. Defendants knew, or should have known, that their refusal to approve physical therapy and prosthetic devices for GEORGENE caused Georgene to be unsafe, to be unable to rehabilitate herself, caused her to gain weight, caused her to be depressed about her looks and her body, and caused her to be fearful and extremely worried about her condition. Defendants were repeatedly told that Georgene was falling and injuring herself without the microprocessor and C-leg, yet Defendants did nothing to assist her to insure that she would not continue to fall and be injured. Defendants knowing the seriousness of GEORGENE's medical condition, knowing the physical damage that could result from denying the care, and knowing that plaintiff would get forced to deal with the emotional and physical implication of the denial of the care for GEORGENE's intentionally, unreasonably and unfairly refused to provide GEORGENE with the requested, medically necessary items thereby placing GEORGENE's safety and life in jeopardy.

76. At all relevant times, defendants owed plaintiffs a duty of care, which they breached.

77. Defendants, and each of them, knew, or with any exercise of reasonable care should have known, that their aforementioned wrongful conduct would result in the delay and/or denial of the benefits GEORGENE was entitled to under the Plan, and would cause plaintiff severe emotional distress. Despite this knowledge, defendants, and each of

24

1   them, negligently and without exercising reasonable care, reviewed and made

2   recommendations and decisions, and otherwise engaged in conduct that directly caused

3   benefits to be delayed and denied under the Plan.

4        78.  Plaintiff is informed and believe, and thereon allege, that defendants, and each of

5   them, have been negligent by other acts or omission of which plaintiff is presently unaware,

6   and which will be shown accordingly to proof at the time of trial.

7        79.  Defendants' conduct described herein was undertaken by the corporate

8   defendants' officers, managing agents, or employees identified herein as DOES 1 through

9   100, inclusive, who were responsible for claims handling and/or decisions.  The

10  aforementioned conduct of said managing agents and individuals was therefore undertaken

11  on behalf of the corporation defendants. Said corporation defendants further had advance

12  knowledge of the actions and conduct of said individuals whose actions and conduct were

13  ratified, authorized and approved by managing agents and by other corporation officers,

14  directors, or managing agents whose precise identities are unknown to plaintiff at this time

15  and are therefore identified as DOES 1 through 100, inclusive.

16       80.  As a direct and proximate results of the negligent conduct of defendants, and

17  each of them, as alleged above, plaintiff has suffered severe physical, mental, and emotional

18  distress and discomfort, including, but not limited to, suffering, anguish, fright, horror,

19  nervousness, grief, anxiety, worry, shock, humiliation, and shame, all to plaintiff's

20  detriment and damages in an amount to be shown according to proof at the time of trial.

21       81.  As a direct and proximate result of the negligence and carelessness of

22  Defendants, and each of them, as aforesaid, Plaintiff was caused to suffer, and did suffer,

23  severe personal injuries, pain and suffering, mental anguish, and emotional distress all to

24  his general damage in an amount within the jurisdiction of this Court.  As a direct and

25  proximate result of the negligence and carelessness of Defendants, and each of them, as

26  aforesaid, Plaintiff has necessarily incurred liability for medical aid and attention,

27  hospitalization, x-rays, nursing care, therapy, and drugs for the proper care and treatment of

28  Plaintiff's said injuries and Plaintiff will continue to incur such liability for an indefinite

    time in the future, all to Plaintiff's special damage in amounts presently unascertained, and

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1   Plaintiff prays leave that when said amounts are ascertained, Plaintiff may be permitted to
2   amend to insert the same herein with appropriate allegations.  As a direct and proximate
3   result of the negligence and carelessness of Defendants, and each of them, as aforesaid,
4   Plaintiff has necessarily suffered loss of earnings, and Plaintiff will continue to suffer such
5   loss for an indefinite time in the future, and Plaintiff's earning capacity in the future has
6   been greatly reduced, all to Plaintiff's further special damage in amounts presently
7   unascertained, and Plaintiff prays leave that when the said amounts are ascertained,
    Plaintiff may be permitted to amend to insert the same herein with appropriate allegations.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff pray for judgment against defendants, and each of
them, as follows:

**AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS,
KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION
HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP,
AND DOES 1 THROUGH  100, INCLUSIVE, FOR BREACH OF THE DUTY OF
GOOD FAITH AND FAIR DEALING**:

1.  Damages for failure to provide benefits under the Plan, plus interest, in
a sum to be determined at the time of trial;

2.  For prejudgment interest on all damages awarded to plaintiff in
accordance with California Civil Code section 3287;

3.  For attorneys' fees, witness fees and costs of litigation incurred by plaintiff to
obtain the Plan of benefits in an amount to be determined at trial;

4.  For economic and consequential damages arising out of the defendants'
unreasonable failure to provide benefits under the Plan.

5.  For general damages for mental and emotional distress in a sum to be
determined at the time of trial;

6.  For punitive and exemplary damages in an amount appropriate to punish or
set an example of defendants,

7.  For costs of suit herein; and

8.  For such other relief as the Court deems just and proper.

**AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH  100, INCLUSIVE, FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS :**

9.  Damages under the Plan, plus interest, and other economic and consequential damages, in an amount to be determined according to proof at the time of trial;

10.  For prejudgment interest on all damages awarded to plaintiff in accordance with California Civil Code section 3287;

11.  For costs of suit herein; and

12.  For such other relief as the Court deems just and proper.

**AS TO THE THIRD CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH  100, INCLUSIVE, FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS:**

13.  For general damages for mental and emotional distress in as sum to be determined at the time of trial.

14.  For non-economic damages for pain and suffering; and

15.  For such other and further relief as the Court deems just and proper.

**AS TO THE FOURTH CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH  100, INCLUSIVE, FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:**

16.  For general damages for mental and emotional distress in as sum to be determined at the time of trial;

17.  Punitive and exemplary damages in an amount appropriate to punish or set an example of defendants;

18.  For non-economic damages for pain and suffering; and

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

19.  For such other and further relief as the Court deems just and proper.

**AS TO THE FIFTH CAUSE OF ACTION AGAINST DEFENDANTS, KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, AND DOES 1 THROUGH 100, INCLUSIVE, FOR NEGLIGENCE:**

20.  For general damages for mental and emotional distress in as sum to be determined at the time of trial.

21.  For non-economic damages for pain and suffering; and

22.  For such other and further relief as the Court deems just and proper.

Date: December 3, 3018

LAW OFFICES OF PATRICIA A. LAW
A PROFESSIONAL CORPORATION

By:_____
PATRICIA A. LAW
Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a Jury trial.

Date: December 3, 3018

LAW OFFICES OF PATRICIA A. LAW
A PROFESSIONAL CORPORATION

By:_____
PATRICIA A. LAW
Attorneys for Plaintiff

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL